May it please the court, Nathan Fenice from Federal Defenders of San Diego on behalf of Mr. Rivera. The substantial risk enhancement never should have been applied in this case. Although I agree with the district court that Mr. Lomeli was transported in a very uncomfortable and unpleasant position, that doesn't justify imposing the substantial risk enhancement. The test is whether Mr. Rivera intentionally or recklessly created a substantial risk that Mr. Lomeli would die or suffer serious bodily injury. I looked at his pictures, counsel, and they're pretty graphic evidence that he was put in a very harmful situation. I agree that it looks very uncomfortable and very unpleasant. But the guideline does demand more. Well, it looks dangerous to me. Well, there was no substantial risk that Mr. Lomeli was going to die or suffer serious bodily injury. What if there had been a car accident? Well, the risk of a car accident is not sufficient to trigger the enhancement. This Court held that in torus floris, and that was the exact holding of this Court. And wouldn't he be particularly susceptible to injury given that he was in that position? It's not just an ordinary car. I mean, it isn't that he's just a passenger in a car or hidden in a compartment. Perhaps, Your Honor. But that is precisely what the issue was in torus floris. And this Court came out the other way on that. The Court found that the likelihood of a car accident is very small. It's not trivial, but it's small. And it's so small that it doesn't justify imposing the enhancement because there's not a substantial risk that there's going to be a car accident. And the reason the court found that there was no substantial risk to him was that   And he had an epilepsy seizure? Yes. What if he had had his seizure before the agents got to him? He had a seizure, right? He did. Mr. Lomeli. So what if it had happened an hour earlier? Unfortunately, Mr. Lomeli suffers from epilepsy, and it does appear that he had an epileptic seizure when he was at the port of entry. So he would have been dead? Because he couldn't move the buckets, his arms are basically weighed down, his legs are weighed down. I don't know if he would have been dead, but it certainly would have been a serious problem. But here's the issue. There's no evidence that Mr. Rivera knew that Mr. Lomeli suffered from epilepsy, and that's very significant because the guideline requires a mens rea of intent or recklessness. So Mr. Rivera cannot intentionally create a situation that will exacerbate Mr. Lomeli's epilepsy if he doesn't know about the epilepsy. And if we turn to the recklessness prong, it's very similar. This Court defined recklessness as it's used in the guideline in a case called Rodriguez-Cruz. It's 255 F.3d 1054. And essentially, the defendant has to be aware of a risk and then unreasonably disregard it. So even the reckless prong requires that Mr. Rivera would be aware of Mr. Lomeli's epilepsy, and there's just no evidence that he was. So although it's very unfortunate that Mr. Lomeli suffered from epilepsy and had a seizure, it's really not relevant to the substantial risk analysis in this case because there's no evidence that Mr. Rivera knew that Mr. Lomeli suffered from epilepsy. One of the other circumstances that the district court cited in support of the enhancement was the fact that there were paint roller refills in the bucket where Mr. Lomeli's head was concealed. And the district court suggested that there may have been a risk of suffocation. I think it's important to point out that the government had the burden of proving a risk of suffocation. And they presented witnesses, and not a single witness testified that Mr. Lomeli's ability to breathe was obstructed, and not a single witness testified that there was a substantial risk of suffocation. In fact, the very first witness that testified, Officer Hersey, who was the first officer to encounter Mr. Lomeli, specifically testified that he was not aware of anything obstructing Mr. Lomeli's ability to breathe and that he did not observe anything in Mr. Lomeli's mouth. Furthermore, the probation officer, who was the first person to recommend this enhancement in the pre-sentence report, after consulting with the case agent, did not find that there was a risk of suffocation. In fact, the probation officer in the pre-sentence report specifically found that Mr. Lomeli's ability to breathe and his ability to breathe in the air supply did not appear to be impeded. So nobody was suggesting that there was a risk of suffocation. And I submit that there was — that's because there was not a substantial risk of suffocation. Maybe there's some risk, but not a substantial risk. And the risk of suffocation is at least as unlikely as the risk of a car accident, which this Court found too speculative to justify the enhancement in torus floris. Let me jump ahead, because you know as well as anyone the guidelines are simply advisory now for district court judges. They're the starting point in sentencing. And so you're — I don't want to say that you raise a lot of arguments, but the gist of your argument is that the sentence was substantively unreasonable. And what I didn't see, and I want you to address in the briefs, is the judge's comments, having the transcript in front of me, it's at the record at 123, about deterrence. I didn't see the word deterrence, or your addressing the judge's comments, that among the 3553A factors he applied, and there were several, and district judges are instructed to go through these, as you know. He says it's clear to me that the sentences of 36 months and 30 months have not deterred him. Even your client acknowledges that. That was a basis for this district judge's sentence. And you say it's still substantively unreasonable that he, in effect, piled on. He considered factors that were already covered by the guidelines to vary from the guidelines and increase the sentence. But deterrence was one of the stated factors, right? It was, Your Honor. And I think that a much lower sentence would have deterred Mr. Rivera, and that is something that I argued in my sentencing memorandum. And during the sentencing hearing, I'm trying to find it here. I think ---- But that's not the issue. The issue is, is it substantively unreasonable for what the district court judge did? I think it is. The primary reason that I think that the sentence was substantively unreasonable is because the district court abused his discretion by failing to give substantial weight to the government's evaluation of Mr. Rivera's substantial assistance. He did. He lowered it from 60 months to 48. But the government was recommending a sentence of 18 months, and the district court imposed a sentence 207 percent greater. Expressly rejecting the 18 months is too low, given the prior 30 and 36-month sentences that had not deterred him. Well, I think that there ---- A lower sentence would have deterred him in this case because the district court could have placed him on a supervised ---- term of supervised release, which he did. Also, Mr. Rivera was facing revocation proceedings in front of another district court judge. Was it unreasonable for the district court judge to make that conclusion under the 3553 factors? I think it was. One of the 3553A factors is to promote justice, and it doesn't promote justice to essentially cheat Mr. Rivera out of the credit he's due for the cooperation he provided to the government. And I think that's the primary reason that the sentence in this case was substantively unreasonable. I think that the Rassam case is very much on point. This case is essentially the inverse of that case. In that case, the district court essentially disregarded the government's recommendation that the defendant should not get any credit for cooperation, and instead the district court disregarded that and granted a significant downward variance for cooperation. This case is the inverse. The government was recommending an 18-month sentence due to the cooperation Mr. Rivera provided. The district court disregarded that and imposed a sentence 270 percent greater. So the next time the government comes before the district court and says, Judge, you have to lower this sentence, you have to vary downward, the district court judge has to say, I agree. I have to do it now because the federal public defender in the case involving U.S. v. Rivera said that judges have to take the government's – the public defender is arguing that judges have to follow the government's recommendation. But putting that aside, where's the line? Where does the district judge say, I have to follow the government's downward variance, but I don't have to follow the government's recommendation when it's a variance upward? Give me some help. Well, I don't think that the district court has to always rubber stamp what the government's recommending, and normally I would definitely oppose that. And I'm not suggesting that Judge Burns had to do that in this case, but this court held in Rassam that it's an abuse of discretion when the district court fails to give substantial weight to the government's evaluation of the extent of a defendant's assistance. And I think imposing a sentence 270 percent greater than what the government's recommending crosses the line. And with that, I'd like to reserve the remaining time for rebuttal. All right. Good morning. May the police court. My name is Ryan Lozar. I'm here this morning on behalf of the United States. First, I'd like to address the defendant's contention that the factual finding that the paint rollers covered the material witness's nose and mouth was clearly erroneous. This was not clearly erroneous because there are, in fact, facts in the record that could have permitted the district judge to reach this conclusion that the paint rollers covered the nose and mouth. And in particular, I'd like to refer the Court to ER 135. This is one of the photos that Judge Fletcher referred to earlier. Here, the defendant says that this photo shows that it's clearly erroneous because there are no paint rollers covering the material witness's face here. However, agent testimony at ER 55 and 56 indicated that paint rollers were first removed from the bucket in order for that photo to be taken. And furthermore, ER 133, the photo at the bottom, which is a long shot, it's taken from a distance. It's hard to see, but it does exhibit where the rollers were positioned before they were actually removed. Counsel, this is the second appeal this week where Judge Burns has rejected where there's an agreement between the public defender and the AUSA to a much lower sentence. And Judge Burns comes in and says, no, I disregard that. I'm going to give a really dramatically higher sentence than what is what's been recommended to me by the parties. Is there anything that you're aware of that would preclude him from doing that? There's nothing that I can think of that would preclude Judge Burns from doing that, no. The dissonance between what the parties jointly recommended here and what Judge Burns recommended is two things. Number one, the fact that the plea agreement that the parties entered into was the product of the fast track program in San Diego. This defendant was arrested on December 15th, and an offer was extended on December 20th. He pled guilty on January 9th. And so this moved very rapidly. And the fast track points that were granted in the interest of expeditious resolution of the case on conservation of public resources. That's something that Judge Burns took issue with later when he conducted his 3553A analysis. In addition, the government concedes that in the original plea agreement we did not recommend the substantial risk enhancement. And so that also contributes to the dissonance that we're talking about. I'm sorry. I didn't quite follow you. So Judge Burns expressed that he disagrees with the fast track plea? Well, when he calculated the guidelines as the first part of his sentencing colloquy, he did grant the two points to the defendant per the terms of the plea agreement. He did so in deference to the United States Attorney's Office's discretion to conduct this program. However, he indicated that he thought that the aggravating factors in the case were such that leniency of this kind was something that he was not inclined to defer  in the 3553A analysis. Does he and his plea colloquy go through the portion of the plea agreement's record at 18 that the sentence is within the sole discretion of the judge that explains to the defendant that despite any recommendations that it's up to me to decide the sentence and if I decide to go upward or downward, you can't withdraw your plea? Is that part of the plea colloquy? I don't think it's part of the plea colloquy. But as Your Honor mentions, it is something that's explicitly mentioned in the contract between the government and the defendant. This appears at, gosh, well, the plea begins at ER 12. It's at ER 18. It's paragraph 9. Oh, thank you. Yes. And so up until the moment when the evidentiary hearing was convened, the government stood by its recommendation, this plea agreement, as it was bound to do. But the plea agreement does say that if the district judge decides to upwardly vary under 3553A, the defendant understands that the government will be able to defend on appeal. And that's why we're here today. I don't have this particular plea agreement in front of me, but don't the fast track agreements generally have an appeal waiver provision? They do. The appeal waiver provision, yes, they do. Yes. And this particular plea waiver, I believe, is standard insofar as the defendant waives the plea, waives appeal, so long as the sentence falls within the guideline range. But if it is an upward variance, he reserves his right to appeal. And I believe that appears at ER 21. If the custodial sentence is greater than the high end of the range, the defendant may appeal. I would like to return to the issue of these paint rollers. Even if this panel were to determine that that was a clearly erroneous factual finding, the government still thinks that there is ample support and evidentiary record here for the substantial risk enhancement. There are a great many factual findings that have not been litigated by the parties in this appeal that support the enhancement. And this all comes from ER 99 to 102. The buckets had puzzle pieces cut out from them. They were form-fitted around the defendant. Then this whole configuration was tightly tied around the defendant. Paint rollers, electric sander, scrapers, other tools were piled in buckets to hide the body. This weight was substantial enough to pin the – I think I was referring to the defendant being in the buckets, but I mean the material witness – was sufficiently heavy to pin his arms, to pin his entire body, such that he was not able to self-extricate. Another factual finding, he was in a very weakened state. He suffered what appeared to be an epileptic seizure and was taken to hospital. With respect to the point that – oh, Your Honor mentioned it earlier, that even absence, take your victim as you find your victim, even to add Mr. Rivera not known that the material witness here was an epileptic, there are a number of other things that could have happened that would have made the condition of transport create a substantial risk of serious bodily injury or death. For instance, the judge here, in this case, he said that a person in these circumstances, essentially in a coffin-like environment, would suffer claustrophobia. And it's unclear whether that was an epileptic seizure or a panic attack, but if you're constrained and you're flailing and you're panicking, there is substantial risk for serious bodily injury. And so the government, in this case, continues to say that it's not a real  And so there's a lot of discussion about whether or not the victim was able to self-extricate or, returning to the paint roller discussion, the paint rollers, even if they weren't covering at the moment, the government maintains that they were, even if they weren't, they were loose in the bucket. And if they become dislodged and over the person's face, he's in the bed of this pickup truck. He can't call out to the driver to help him. His hands are pinned at his sides. He wouldn't be able to go and reach and remove it if that, in fact, happened. And so in light of these indisputed facts, even in the absence of that contested factual finding, it's the government's position that the enhancement still applies here. Does Ressim make any difference? Did this judge give substantial weight to the government's evaluation? The judge did give substantial weight to the government's evaluation. One thing that I'd like to clarify is that the original plea agreement here, it was made in the absence of consideration about the cooperation. So the grand jury assistant, as I mentioned before, this offer was made very, very swiftly. There's some indication that the defense counsel told the grand jury assistant that some cooperation had occurred. But at ER, I believe it's ER 112, again, this is another case like the previous one where there are multiple lawyers involved. There's a grand jury assistant and there's a sentencing assistant and now there's  a plea. The sentencing assistant, this is a different assistant at the sentencing stage and that's because that was the assistant who did work with this defendant at cooperation. And if you look at, actually it's ER 110, I said 112 earlier, excuse me. The sentencing assistant said, I need to make this clear, there was no charge bargaining. This was a fast-track case. The, oh, but this is in answer to the district judge's question. Was the plea a charge bargain for the cooperation? I need to make this clear. This was no charge bargain. This was a fast-track case. And so that, the joint recommendation that arose out of the plea agreement that we're talking about today, when the judge decided to upwardly vary, he wasn't disregarding a cooperation recommendation. In fact, what happened is that when the sentencing assistant who was involved with the cooperation, he discussed in detail with the judge at the sentencing colloquy what the cooperation actually was, what his recommendation would have been, had he been involved at the earlier stage. And he recommended two points, possibly three, for the introduction that this defendant made. And in fact, the 48 months, the 12-month reduction from the 60-month sentence that the judge imposed, it's, it roughly, it approximates what a two-point reduction would be. But the government didn't submit a 5k, 1.1 motion or order? The government did not, no. This was just done orally. Well, it was, some mention of the cooperation was under the sentencing memorandum of the defendant. That's filed under seal with this Court. Also, the rest, though, was just handled orally at the sentencing hearing. And with that, I see that my time has concluded. Unless Your Honors have additional questions, I rest. Thank you. First, I'd like to clarify something about the plea agreement. The basis for this plea agreement was cooperation. It's true that the grand jury, AUSA, Ms. Booth, offered this fast-track plea agreement. On page 122 of the record, I'm explaining to Judge Burns that we did not accept the plea agreement. My client did not accept the plea agreement because it was just based on fast track. I notified her that there was cooperation. She got me in touch with Mr. Shepard, who was the AUSA who appeared at the sentencing hearing. He's the one that said, if your client wants this plea agreement, I'll take the case. Even though I don't do alien smuggling cases, I do hard narcotics, I'll take this case so I can explain to Judge Burns your client's cooperation. And that will be the basis for this plea agreement. I'm explaining that to the judge on page 122 of the record. Your client read the plea agreement, acknowledged that he also read the portion that says the sentence is within the sole discretion of the judge. Of course. I just wanted to clarify that this is not just a fast-track deal. The basis for it was the cooperation. That's why the government kept this offer open and allowed Mr. Rivera to accept it after they had a chance to evaluate his cooperation. Because initially I told the grand jury, AUSA, my client's not going to take this deal unless it's based on cooperation. Generally, abstractly, what was the nature of the cooperation? Were there others involved in this? Or was it in this particular smuggling? No, no. It was totally unrelated to this case. Okay. It does appear in my sentencing memorandum, which I filed under seal. Uh-huh. It led to the arrest and successful prosecution of four individuals. All right. The other point I'd like to make is Mr. Losar just addressed some of the other risks that he thinks justified the substantial risk enhancement. As I mentioned, nobody testified that there was a substantial risk of suffocation by one of these paint roller refills. There's no evidence that Mr. Rivera knew that Mr. Lomeli suffered from epilepsy, and that's a requirement for that to be a factor justifying the enhancement, because the guideline does require a mens rea of intent or recklessness. And also Mr. Losar mentioned that Mr. Lomeli could not extricate himself. This Court has never held that a material witness's ability, inability to extricate himself from a vehicle automatically justifies the enhancement. Not automatically, but it's definitely been a factor in many of our cases. It can be a factor, but there still has to be other circumstances that create a substantial risk of death or serious bodily injury, and that's not present here. All right. Thank you, Counsel. United States v. Rivera is submitted. We'll take Jefferson.
judges: Mendez, Fletcher, Wardlaw